1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| RAYMOND TSCHUDY, individually, on behalf of himself, all others similarly situated, and on behalf of the general public,<br><br>                              Plaintiff,<br><br>       vs.<br><br>J.C. PENNEY CORPORATION, INC., a Delaware corporation,<br><br>                              Defendants. | CASE NO. 11-cv-1011 JM (KSC)<br><br>ORDER DENYING MOTION TO STRIKE CLASS ALLEGATIONS, GRANTING MOTION FOR CLASS CERTIFICATION, AND DENYING RELATED EVIDENTIARY MOTIONS |

18          Before the court are two motions regarding whether this case can be

19  litigated as a class action, as well as several motions to strike evidence related

20  to class certification.  On November 8, 2013, J.C. Penney Corporation, Inc. ("JCP")

21  filed a motion to strike the class-action allegations from Plaintiffs' second amended

22  complaint ("MTS").  (Doc. No. 93.)  On June 9, 2014, Plaintiffs filed a motion to

23  certify this case as a class action ("MTC").  (Doc. No. 119.)  Both motions were

24  fully briefed.  The parties also filed several motions to strike items of evidence

25  related to class certification.  (Doc. Nos. 97, 121-1, and 124.)  For the reasons set

26  forth below, the court denies JCP's motion to strike the class-action allegations,

27  grants Plaintiffs' motion to certify this case as a class action, and denies the

28  evidentiary motions.

**BACKGROUND**

**A.     Procedural Background**

      **1.     Original Complaint and Removal**

    Plaintiff Tschudy filed the original complaint in this case on April 5, 2011, in San Diego Superior Court.  (Doc. No. 1-1.)  Defendants removed the case to this court on May 9, 2011, pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).  (Doc. No. 1.)

      **2.     The Second Amended Complaint**

    On February 8, 2012, Plaintiffs filed the operative second amended complaint ("SAC").  (Doc. No. 45.)  In the SAC, Plaintiffs contend that under California law vacation benefits accrue and vest as employees work, and that JCP's vacation policy, called My Time Off ("MTO"), causes management associates ("MA") and part-time non-management associates ("PTNMA") to forfeit vacation benefits "if such employees are not employed on the first day of the calendar month following the month or months during which such paid vacation benefits were earned."  (Id. ¶ 74.)  The provisions Plaintiffs challenge (the "challenged provisions") read:

> Management - You become eligible and receive your first deposit on the first day of the third month of employment.
> . . .
> Part-Time Non-Management - You become eligible and receive your first deposit on the first day of the month following 12 months of employment if you average 25 or more hours during the first 48 weeks of employment.  You must qualify each year for MTO deposits.

(Id.)

    Based on these provisions, Plaintiffs assert two causes of action, for (1) forfeiture of wages, under California Labor Code § 200 et seq.; and (2) unlawful business practices, under California Business & Professions Code § 17200 et seq.[1] (Id. ¶¶ 73–93.)  Specifically, Plaintiffs claim that the MTO violates California

---

[1] The SAC also presented claims under Illinois law, but those claims were transferred to Illinois.  (See Doc. No. 55.)

Labor Code §§ 201 and 202 (timely payment of wages upon employee's termination or resignation); § 203 (waiting-time penalties for failure to comply with §§ 201 and 202); § 204 (payment of all compensation earned within each pay period); and § 227.3 (prohibition on forfeiture of vested vacation time upon termination), and that these violations also constitute unlawful business practices within the meaning of California Business & Professions Code § 17200 *et seq.*  (Id. ¶¶ 74–82, 84.)

On their claim for forfeiture of wages Plaintiffs seek damages, penalties, interest, costs and fees, and an injunction prohibiting JCP from continuing the challenged practices.  (Id. ¶ 103.)  On their claim for unlawful business practices Plaintiffs seek disgorgement, restitution, interest, costs and fees, and an injunction prohibiting JCP from continuing the challenged practices.  (Id.)

### 3.    Summary Judgment

On August 20, 2012, JCP filed a motion for summary judgment or summary adjudication ("MSJ").  (Doc. No. 59.)  JCP asserted that it was entitled to judgment because its written policy unambiguously advises employees that they are eligible to accrue vacation benefits "only *after* the expiration of their waiting period," and the policy makes clear that the deposits of vacation time employees receive are advances for future work rather than compensation for past work.  (Doc. No. 59-1 at 10.)  As the basis of its arguments, JCP relied on language in detailed versions of the policy (referred to here and in previous orders as "JMTOs"), and it asserted that all new-hires, including Plaintiffs, received copies of the policy.  (Id., Harris Decl. ¶¶ 5–10.)

Plaintiffs opposed JCP's motion, asserting that they had never received the JMTO, and that the only policy documents they had ever been given were shorter versions (referred to here and in previous orders as "EMTOs") that did not indicate that vacation deposits were advances for future work.  (Doc. No. 66 at 3–6, 16.)  They argued that summary judgment was inappropriate because there was a material

dispute regarding which was the controlling plan.  (Id. at 16.)

On January 28, 2013, the court denied JCP's motion for summary judgment, as JCP had not shown that Plaintiffs had ever received the JMTOs, and the EMTOs and other statements Plaintiffs had received did not make clear that vacation deposits were advances for future work.  (Doc. No. 78.)  In a footnote the court stated:

> However, had JCP established that the Plaintiffs received the JMTOs, the court's analysis might have been different.  The JMTO is more extensive, even providing examples about when an employee who started on a given date would begin earning MTO benefits.  That additional information might have put PTNM employees on notice about the details of JCP's MTO policy.  But the court need not examine that scenario at this juncture as JCP has not shown conclusively that the Plaintiffs received the JMTOs.

(Id. at 12 n.8.)

### 4.    Motions on Class Certification

On November 8, 2013, JCP filed the instant  motion to strike the class allegations from the SAC.  (Doc. No. 93.)  Plaintiffs opposed the motion, (Doc. No. 96), and moved to strike some of the evidence JCP submitted with its motion, (Doc. No. 97), and JCP filed a reply, (Doc. No. 114).

On June 9, 2014, Plaintiffs filed the instant motion to certify this case as a class action.  (Doc. No. 119.)  JCP opposed the motion, (Doc. No. 121), and moved to strike some of the evidence Plaintiffs submitted with their motion, (Doc. No. 121-1).  Plaintiffs replied, (Doc. Nos. 122, 123), and moved to strike some of the evidence JCP filed with its opposition.  (Doc. No. 124.)

## B.    Legal and Factual Background

### 1.    California Law

California does not require employers to offer employees paid vacation.  See California Department of Labor Standards Enforcement Policies and Interpretation Manual ("DLSE Manual") § 15.1.2 (2006) ("Neither the statute nor the case law requires that any employer provide vacation benefits; the law only addresses the

requirements which a vacation plan, if offered, must meet."). But, if an employer chooses to offer vacation benefits, the benefits are considered "in effect, additional wages for services performed," Suastez v. Plastic Dress-Up Co., 31 Cal. 3d 774, 779 (1982), or "a form of deferred compensation," id. at 780. Hence, "[a] proportionate right to a paid vacation 'vests' as the labor is rendered." Id. at 784. Once the right has vested, California Labor Code § 227.3 protects it from forfeiture. See id. Section 227.3 requires employers to pay terminated employees for vested vacation time in accordance with the "contract of employment or employer policy," and prohibits contracts and policies that "provide for forfeiture of vested vacation time upon termination."[2]

California allows employers who offer vacation to place certain limits on it, consistent with these rules. For example, "[a]n employer is entitled to adopt a policy specifying the *amount* of vacation pay an employee is entitled to be paid as wages, depending on the length of service." Owen v. Macy's, Inc., 175 Cal. App. 4th 462, 464 (2009) (internal quotation marks omitted). And, because employers are not required to offer employees vacation, they can impose a waiting period during which no vacation is earned or vested "[i]f an express written company policy forewarns new employees that their compensation package does not include paid vacation during their initial employment." Id.; see also DLSE Manual § 15.1.3 ("Vacation plans which establish probation periods during which no vacation pay is vested are permitted.").

---

[2] Section 227.3 reads:

Unless otherwise provided by a collective-bargaining agreement, whenever a contract of employment or employer policy provides for paid vacations, and an employee is terminated without having taken off his vested vacation time, all vested vacation time shall be paid to him as wages at his final rate in accordance with such contract of employment or employer policy respecting eligibility or time served; provided, however, that an employment contract or employer policy shall not provide for forfeiture of vested vacation time upon termination.

-5-

**2.      JCP's My Time Off Policy**

As noted above, JCP's vacation policy is embodied in its My Time Off ("MTO") plan.  At this point there appear to be five documents that mention or contain some version of the MTO, some of which exist in multiple iterations:

> 1. **JMTO**—The full-length policy statement JCP relies on, in two iterations dated January 1, 2007, and December 31, 2008, respectively, (MSJ, Harris Decl., Exhs. E & F);
>
> 2. **EMTO**—The plan summary Plaintiffs rely on, from Your Benefits Book 1, dated January 1, 2007, (MTC, Ostroff Decl., Exh. 5, Part 1 at 5–14);
>
> 3. **New Hire Guide to Benefits**—In iterations for various years 2008 through 2012, (MTC, Ostroff Decl., Exh. 5, Part 2 at 18–25 (2008), 32–39 (2009); Exh. 5, Part 3 at 5–13 (2010), 16–22 (2012));
>
> 4. **Benefits to Go**—Which JCP describes as a "quick version" of the MTO, (MTC, Ostroff Decl., Exh. 5, Part 2 at 38–39); and
>
> 5. **The Associate Guide to Winning Together**—In two iterations dated May 2007 and January 2009, respectively, (Doc. No. 76, Harris Decl., Exhs. A & B).

With minor variations in wording, the first four documents all contain the provisions Plaintiffs challenged in the SAC:

> Management - You become eligible and receive your first deposit on the first day of the third month of employment.
> . . .
>
> Part-Time Non-Management - You become eligible and receive your first deposit on the first day of the month following 12 months of employment if you average 25 or more hours during the first 48 weeks of employment.  You must qualify each year for MTO deposits.

(MSJ, Harris Decl., Exh. E. at 2 (Jan. 1, 2007 JMTO); Exh. F. at 2 (Dec. 31, 2008 JMTO); MTC, Ostroff Decl., Exh. 5, Part 1 at 13 (EMTO); <u>see also</u> MTC, Ostroff Decl., Exh. 5, Part 2 at 22 (2008 New Hire Guide), 35 (2009 New Hire Guide), 38 (Benefits to Go); MTC, Ostroff Decl., Exh. 5, Part 3 at 12–13 (2010 New Hire Guide), 20 (2012 New Hire Guide).)  The Associate Guide to Winning Together

contains only a brief description and does not explain how benefits are calculated.[3]

The first four documents listed above all also contain some explanation of how MTO benefits are calculated.  For example, the EMTO explains that "MTO is calculated based on your average week, job classification and service months as of December 31.  You must be employed on the first day of each month to receive an MTO deposit.  Using the following table and formulas, you can calculate your own MTO deposit. . . .  Average Week × Annual MTO Weeks Factor = Annual MTO ÷ 12 Months = Monthly MTO Deposit."  (MTC, Ostroff Decl., Exh. 5, Part 1 at 13.)

The JMTOs, however, include details the other documents do not.  For example, the JMTOs provide the following example:  "If you are hired on October 30, you will be eligible and receive your first MTO deposit on November 1 of the following year, provided you averaged 25 hours or more per week in the 48-week period beginning October 30."  (MSJ, Harris Decl., Exh. E at 2, Exh. F at 2.)  And only the JMTOs state, "If you are *actively at work* on the first day of each month, you will receive a deposit of MTO hours that you can earn during that month.  The hours are advanced to you and are available for your immediate use as soon as they are deposited into your account."  (MSJ, Harris Decl., Exh. E at 3, Exh. F at 3.)

According to Jeff Marcellus, whom JCP designated as most knowledgeable

---

[3]  Both versions of The Associate Guide to Winning Together state as follows:

> We recognize that you may have personal situations and responsibilities to take care of during normal working hours.  Paid time off provides you with pay for time off during hours you are scheduled to work.  PTO (Paid Time Off) and MTO (My Time Off) are our paid time off benefits programs.  To participate in PTO, you must have been Benefits Eligible on December 31, 2003, and have remained Benefits Eligible.  All other Associates who meet the eligibility requirements receive monthly deposits of MTO that can be used during that month or the remainder of the year.  When possible, submit all requests for time off to your Supervisor as far in advance as possible.  Certain dates are unavailable, such as blackout periods resulting from key business activities.  PTO/MTO balances are available on the Associate Kiosk.

(Doc. No. 76, Harris Decl., Exh. A at 28; Exh. B. at 24.)

on the MTO, the policy was first implemented in California on January 1, 2004, has remained substantively the same since then, and is applied according to its terms to all MA and PTNMA.  (MTC, Ostroff Decl., Exh. 4 at 5–7, 9–12.)  And, according to Anne Buckingham, JCP's designee on matters concerning JCP's adoption, implementation, and enforcement of the MTO, the JMTO only "exists online on the PowerLine website" and has "never existed in any . . . format other than online."  (MTC, Ostroff Decl., Exh. 5, Part 1 at 15.)  What information employees received about the existence of the JMTO, its significance, or how to access it remains unclear.

### 3.   The Named Plaintiffs[4]

According to the filings, Raymond Tschudy was a PTNM JCP employee in California from February 11, 2007, until he voluntarily ended his employment on February 27, 2008.  (Doc. No. 119-1 at 8.)  He completed 53 weeks of employment and averaged more than 25 hours per week during his entire employment.  (Id.)  According to Tschudy, JCP did not pay him vacation benefits after his termination because he was not employed on March 1, 2008.  (Id. at 9.)  According to JCP, Tchudy was not entitled to vacation pay because his employment ended on February 29, 2008, "one day short of attaining eligibility to earn MTO benefits."  (Doc. 93-1 at 6.)

Sheila Walker was a PTNM JCP employee in California from September 17, 2008, through April 2010.  (Doc. No. 119-1 at 9.)  She worked more than 48 weeks and averaged 24.15 hours a week until she went on medical leave in October 2009, after which she did not return to work.  (Id.)  Her employment ended in April 2010. (Id.)  The precise factual basis for her claim is unclear, but, like the other plaintiffs, she claims that she "forfeited vacation because of the MTO."  (Id.)

---

[4]  The SAC identified three additional plaintiffs who are no longer involved in this case.  Laura Garcia and Lore Rednour's Illinois-law claims were transferred to Illinois.  (Doc. No. 55.)  The parties voluntarily dismissed Leticia Hinojosa. (Doc. No. 88.)

Kamryn Candelaria was a PTNM JCP employee in California for almost five years, from July 2007 through May or June of 2012 (after this lawsuit was filed), when she resigned to take a full-time position at a bank.  (Id. at 10.)  During her first 48 weeks of employment she averaged about 24.26 hours per week.  (Id.)  She never received MTO benefits.  (Id.)  According to JCP, she satisfied the policy's waiting period, but she was never eligible for MTO benefits because "she did not average at least 25 hours of work over the relevant period."  (Doc. No. 93-1 at 8–9.)

**DISCUSSION**

The court addresses JCP's threshold arguments regarding standing and judicial estoppel before turning to class certification, appointment of counsel, and the parties' evidentiary motions.

**A.    Standing to Seek Injunctive Relief**

In JCP's filings in support of its motion to strike and in opposition to Plaintiff's motion to certify this case as a class action, it contends that Plaintiffs lack Article III standing to seek injunctive relief on their claim under California Business & Professions Code § 17200 et seq., because none of them are current JCP employees.  (Doc. No. 93-1 at 3 n.3; Doc. No. 121 at 24–25.)  Although not raised by the parties, the same concern applies to Plaintiffs' standing to seek injunctive relief on its claim under California Labor Code § 200 et seq.

"In a class action, the plaintiff class bears the burden of showing that Article III standing exists."  Ellis v. Costco Wholesale Corp., 657 F.3d 970, 978 (9th Cir. 2011).  "Standing requires that (1) the plaintiff suffered an injury in fact, i.e., one that is sufficiently concrete and particularized and actual or imminent, not conjectural or hypothetical, (2) the injury is fairly traceable to the challenged conduct, and (3) the injury is likely to be redressed by a favorable decision."  Id. (brackets and internal quotation marks omitted).  "Plaintiffs must show standing with respect to each form of relief sought.  Standing exists if at least one named plaintiff meets the requirements."  Id. (citation omitted).

-9-

A plaintiff seeking prospective injunctive relief "must demonstrate that he has suffered or is threatened with a concrete and particularized harm, coupled with a sufficient likelihood that he will again be wronged in a similar way." Bates v. United Parcel Service, Inc., 511 F.3d 974, 985 (9th Cir. 2007) (citation and internal quotation marks omitted). To satisfy the second requirement, there must be a "real and immediate threat of repeated injury." Id. (internal quotation marks omitted). When evaluating standing, "[the court] must look at the facts as they exist at the time the complaint was filed." Slayman v. FedEx Ground Package Sys., Inc., 765 F.3d 1033, 1047 (9th Cir. 2014) (internal quotation marks omitted).

In the present case, the initial complaint was filed in April 2011. By that time Tschudy and Walker had long ceased their employment at JCP, as Tschudy's employment at JCP ended in 2008, and Walker's ended in 2009. Consequently, when the case was filed, they "lacked standing to seek injunctive or declaratory relief because they would not stand to benefit from such relief." Id. at 1047–48 (internal quotation marks omitted); see also Ellis, 657 F.3d at 988 ("[O]nly current employees have standing to seek injunctive relief."). Candelaria, however, was still employed by JCP when the complaint was filed and did have standing to seek injunctive relief at the time. But, because she was no longer employed by JCP as of May or June of 2012, "[her] claims for prospective relief became moot because [she] could no longer benefit from such relief." Slayman, 765 F.3d at 1048.

"[W]here, as here, the plaintiff's claim becomes moot before the district court certifies the class, the class action normally also becomes moot" unless an exception to mootness doctrine applies, such as the exceptions for inherently transitory claims or claims mooted by the defendant's litigation strategy. Id. Neither exception applies here. The claims are not inherently transitory, as the putative class is not constantly changing in the sense that some members leave the class while others come in. See Sze v. INS, 153 F.3d 1005, 110 (9th Cir. 1998) ("An inherently transitory claim is one where there is a constantly changing putative

class, and where the trial court will not have enough time to rule on a motion for class certification before the proposed representative's individual interest expires." (citation and internal quotation marks omitted)).  Nor does it appear that JCP mooted Candelaria's claim by terminating her.  Rather, she indicates that she left her employment at JCP voluntarily.  Accordingly, her claims for injunctive relief are moot.

Because Tschudy and Walker did not have standing to seek prospective injunctive relief when the suit was filed, and Candelaria's claims for injunctive relief became moot before Plaintiffs moved for class certification, none of the named Plaintiffs have standing to seek injunctive relief on behalf of the class.

Where, as here, the named plaintiff's claim became moot before the class was certified, some Ninth Circuit cases have suggested that the district court should consider whether a putative class member with a live claim should be allowed to intervene.  See Wade v. Kirkland, 118 F.3d 667, 670 (9th Cir. 1997); Kennerly v. United States, 721 F.2d 1252, 1260 (9th Cir. 1983); see also Newberg on Class Actions § 2:17 (5th ed. 2014) (discussing substitution of class representatives in claims mooted before a ruling on class certification).  In Kennerly, such an analysis was necessary because other putative class members "may have relied" to their detriment "on [the class representative's] asserted representation of the class." Kennerly, 721 F.2d at 1260.

In this case, however, Plaintiffs' only response to JCP's standing arguments is that "restitution may still be obtained without also obtaining an injunction under [California Business & Professions Code § 17200 et seq.]," and that they "seek[] to recover on behalf of all class members the vacation that should have accrued but for the unlawful terms in JCP's MTO."  (Doc. No. 122 at 9.)  Plaintiffs have not proposed intervention by a putative class member who has a live controversy, despite two opportunities to do so, nor have they offered any argument that putative class members may have detrimentally relied on their asserted

representation of the class.  See Sze, 153 F.3d at 1010 (the district court was not

required to consider intervention where plaintiffs had not shown that putative class

members had relied on plaintiffs' asserted representation, and it was not the case

that putative class members' case would be time-barred but for the relation back

of a later class certification).  Because Plaintiffs do not have standing to seek

injunctive relief on either of their claims and have not proposed intervention by

a putative class member with a live claim, they cannot seek injunctive relief on

behalf of the class.  Their claims for damages, penalties, restitution, disgorgement,

and fees and costs remain.

**B.    Judicial Estoppel**

In their motion for class certification, Plaintiffs assert that discovery

since summary judgment has confirmed that "[a]ll iterations of JCP's MTO

are substantively identical," and that "[t]he only variations are non-substantive

introductions and examples of how to calculate benefits."  (Doc. No. 119-1 at 3.)

JCP responds that Plaintiffs should be judicially estopped from making these

statements because at summary judgment Plaintiffs argued that there were material

differences between the various MTO documents that precluded summary judgment

for JCP.  (Doc. No. 121 at 3.)

Judicial estoppel is an equitable doctrine, invoked by a court at its discretion,

that "generally prevents a party from prevailing in one phase of a case on an

argument and then relying on a contradictory argument to prevail in another phase."

New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (internal quotation marks

omitted).  Although there are no rigid prerequisites for applying judicial estoppel,

the Supreme Court has instructed that "[the] party's later position must be clearly

inconsistent with its earlier position," and that additional considerations include

"whether the party has succeeded in persuading a court to accept that party's earlier

position, so that judicial acceptance of an inconsistent position in a later proceeding

would create the perception that either the first or second court was misled," id. at

750 (internal quotation marks omitted), and "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped," id. at 751.

The focus of the summary judgment arguments was whether JCP employees were effectively put on notice—and, as a result, contractually bound—by JCP's practices regarding vacation benefits.  At that juncture of the case, the emphasis was not upon the legality of deferring eligibility or receipt of earlier "deposited" or "earned" vacation benefits.  Put another way, the earlier summary judgment filings and court decision did not comprehensively address whether JCP's particularized deferral of accrued vacation time constitutes a forfeiture proscribed by California law.  Moreover, while this court's earlier summary judgment ruling stated, as a general proposition, that JCP may require a waiting period as a condition for vacation benefits to vest, this court did not mean to imply that JCP's practice categorically did or did not pass muster on the forfeiture question.

Since the court ruled on summary judgment, it has become more clear that the iterations of JCP's vacation policy are less important than the reality that they essentially share the complained-of features.  Accordingly, it is rather immaterial for purposes of class certification whether these shared MTO features were communicated to an employee by EMTO, JMTO, word of mouth, handbook, or other means.

In sum, the court finds that judicial estoppel is not appropriate here, as there is no clear inconsistency between Plaintiffs' arguments at summary judgment and their position now.  Plaintiffs appear to assert only that all versions of the MTO contain the challenged provisions.  That is not clearly inconsistent with their argument at summary judgment that there were material differences between the JMTO and the other policy documents that precluded summary judgment.

///

///

-13-

1   **C.    Class Certification**

2   **1.    Legal Standards**

3   "The class action is an exception to the usual rule that litigation is conducted

4   by and on behalf of the individual named parties only." <u>Wal-Mart Stores, Inc. v.</u>

5   <u>Dukes</u>, — U.S. —, 131 S. Ct. 2541, 2550 (2011) (internal quotation marks omitted).

6   To come within the exception, a putative class-action plaintiff must "affirmatively

7   demonstrate" that the claim meets each of the four requirements of Federal Rule of

8   Civil Procedure 23(a) and "at least one of the provisions of Rule 23(b)." <u>Comcast</u>

9   <u>Corp. v. Behrend</u>, — U.S. —, 133 S. Ct. 1426, 1432 (2013).  Rule 23(a) requires

10  that "(1) the class is so numerous that joinder of all members is impracticable;

11  (2) there are questions of law or fact common to the class; (3) the claims or defenses

12  of the representative parties are typical of the claims or defenses of the class; and

13  (4) the representative parties will fairly and adequately protect the interests of the

14  class." Fed. R. Civ. P. 23(a); <u>Wal-Mart Stores</u>, 131 S. Ct. at 2548 (internal

15  quotation marks omitted).  Rule 23(b)(3), the only Rule 23(b) subsection under

16  which Plaintiffs propose certification, requires the court to find that "the questions

17  of law or fact common to class members predominate over any questions affecting

18  only individual members, and that a class action is superior to other available

19  methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P.

20  23(b)(3).

21  "[C]ertification is proper only if the trial court is satisfied, after a rigorous

22  analysis," that the requirements of Rule 23 are satisfied. <u>Comcast</u>, 133 S. Ct. at

23  1432 (internal quotation marks omitted).  "Such an analysis will frequently entail

24  overlap with the merits of the plaintiff's underlying claim." <u>Id.</u> (internal quotation

25  marks omitted).  "The district court is required to examine the merits of the

26  underlying claim in this context, [but] only insomuch as it must determine whether

27  common questions exist; not to determine whether class members could actually

28  prevail on the merits of their claims." <u>Ellis</u>, 657 F.3d at 983 n.8.  The court's review

1  of the merits should be "limited to those aspects relevant to making the certification

2  decision on an informed basis." Fed. R. Civ. P. 23 advisory committee notes.

3  "To hold otherwise would turn class certification into a mini-trial." Ellis, 657 F.3d

4  at 983 n.8.

5        **2.**    **Adequacy of the Class Definition**

6        "Though not explicitly stated in Rule 23, courts have held that the class must

7  be adequately defined and clearly ascertainable before a class action may proceed."

8  Algarin v. Maybelline, LLC, 300 F.R.D. 444, 454 (S.D. Cal. 2014). "A class is

9  sufficiently defined and ascertainable if it is administratively feasible for the court

10  to determine whether a particular individual is a member." Id. (internal quotation

11  marks omitted). Typically, that requirement is satisfied "if [class] members can

12  be ascertained with reference to objective criteria." Id. (internal quotation marks

13  omitted).

14        In their motion for certification, Plaintiffs propose the following class

15  definition:

16

17        Part-Time Non-Management Associates and Management Associates
      employed in California by JC Penney from April 5, 2007 through the
      date of trial who, according to JC Penney's records, were not permitted

18        to accrue, or were not paid, all accrued and unused My Time Off.

19  (Doc. No. 119-1 at 10.)[5]

20        Although the proposed definition is somewhat inartful, the court construes

21  the proposed class as consisting of those JCP employees who were not permitted

22  to accrue, or who were not paid, vacation benefits pursuant to the challenged

23

24            [5]  The definition Plaintiffs propose in their MTC is narrower than the

25  definition they proposed in the SAC, which was:

26        [A]ll similarly-situated former and current California employees of
      [JCP] who, during the four years prior to the commencement of this

27        action . . . forfeited accrued vacation benefits and/or were denied
      compensation in lieu thereof pursuant to [JCP]'s vacation policies.

28  (SAC ¶ 53.) JCP does not object to the narrowing of the definition.

provisions in JCP's uniform MTO policy during the proposed class period. Thus construed, the definition is sufficiently ascertainable, as it provides objective criteria for identifying class members.

JCP responds, however, that the proposed definition is grossly overbroad because it includes (1) employees who would not be entitled to benefits under any reasonable reading of policy, such as those who were employed for only a week or a day, those who never averaged 25 hours per week, and those who were not employed on the first day of the thirteenth month of their employment; (2) 13,685 seasonal workers who have no reasonable expectation of receiving time off because they are told that there is a blackout period for the duration of their employment during which no vacation can be taken; (3) current employees (approximately 10,586 of them) who, even if Plaintiffs prevail on the merits, are not eligible for payment for vacation time under California Labor Code § 227.3 because (according to JCP) that provision applies only to terminated employees; (4) 32,127 employees hired after July 17, 2009, who executed binding arbitration agreements that include class-action waivers; and (5) another 4,000 employees who executed releases in JCP's favor. (Doc. No. 121 at 21–24 & nn. 21, 26.)

The first two arguments appear to be that those who do not satisfy the MTO's eligibility requirements must be excluded from the class. The problem, however, is that the requirements JCP refers to—that PTNMA must (1) average 25 or more hours (2) for 48 weeks and (3) be employed on the first day of the month following 12 months of employment—are the very provisions Plaintiffs contend are unlawful. Such a merits-based exclusion would be inappropriate at this point and, regardless, would not affect the court's ascertainability analysis.

The third argument, that no current employees can be included in the class because California Labor Code § 227.3 requires compensation only for terminated employees, suffers from a similar defect. Plaintiffs assert that courts have extended § 227.3 to protect current employees, not just terminated employees, (Doc. No. 119-

1 at 2), while JCP contends that Plaintiffs are wrong on that point, (Doc. No. 121 at 22 n.23). The court cannot resolve this issue without ruling on its merits. Beyond that, however, JCP has not offered any argument or authority explaining why, even if it is correct on that point, current employees (who have not been terminated, but may be) cannot be included in the class.

JCP's fourth and fifth arguments, that the class cannot include those who executed arbitration agreements or signed releases in JCP's favor, are more substantial, given the strong federal policies favoring enforcement of arbitration agreements. But this court has not yet determined whether the arbitration agreement would bar this lawsuit, the present motions are not the proper vehicle for deciding the issue, and JCP offered no evidence of the 4,000 signed releases it refers to. Moreover, other courts to have confronted similar claims have concluded that "the fact that some members of a putative class may have signed arbitration agreements or released claims against a defendant does not bar class certification." Avilez v. Pinkerton Gov't Servs., 286 F.R.D. 450, 474 (C.D. Cal. 2012) (internal quotation marks omitted); Herrera v. LCS Fin. Servs. Corp., 274 F.R.D. 666, 681 (N.D. Cal. 2011). The court agrees.

Accordingly, the court finds that the proposed class definition is sufficiently ascertainable and not too broad. This conclusion does not foreclose the possibility that subclasses may be created in the future to address these issues as necessary. See Fed. R. Civ. P. 23(c)(3)(5).

### 3. Rule 23(a) Requirements

As discussed above, to satisfy Rule 23(a) a case must meet four requirements: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. See Wal-Mart Stores, 131 S. Ct. at 2548. The court addresses each below.

#### a. Numerosity

Rule 23(a)(1) requires the proposed class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In this

context, "impracticability does not mean impossibility, but only the difficulty or inconvenience of joining all members of the class." Harris v. Palm Springs Alpine Estates, Inc., 329 F.2d 909, 913–14 (9th Cir. 1964) (internal quotation marks omitted).  In determining whether numerosity is satisfied, the court "may consider reasonable inferences drawn from [the] facts before [it]." Gay v. Waiters' & Dairy Lunchmen's Union, 549 F.2d 1330, 1332 n.5 (9th Cir. 1977).

Plaintiffs assert, based on data JCP produced in July 2013, that there are approximately 64,593 class members, which includes 53,637 terminated PTNMA; 10,266 current PTNMA; 369 terminated MA; and 361 current MA.[6]  (Doc. No. 119-1 at 15.)  In its motion to strike, JCP asserts that "this matter involves more than 62,000 employees," (Doc. No. 93-1), and in its opposition to Plaintiff's motion for certification, JCP does not dispute that numerosity is satisfied.  There is no doubt that joinder of such numbers is impracticable.  Accordingly, the court finds that numerosity is satisfied.

### b.   Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." Wal-Mart Stores, 131 S. Ct. at 2551 (internal quotation marks omitted).  "This does not mean merely that they have all suffered a violation of the same provision of law." Id.  Rather, "[t]heir claims must depend upon a common contention," which "must be of such a nature that it is capable of classwide resolution," so that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id.  But "all questions of fact and law need not be common to satisfy the rule." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998).  Rather,

---

[6]   According to Plaintiffs' counsel, the sum of PTNMA and MA exceeds 64,593 because several hundred putative class members worked in more than one capacity.  (MTC, Kostas Decl. ¶ 8.)

"[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies." Id. For purposes of this inquiry, "even a single common question will do." Wal-Mart Stores, 131 S. Ct. at 2556 (brackets and internal quotation marks omitted).

In this case, the question common to all putative class members' claims is whether the challenged provisions in JCP's uniform MTO violate California law. Such a legal question is the type that can be answered on a classwide basis. See Stiller v. Costco Wholesale Corp., 298 F.R.D. 611, 624 (S.D. Cal. Apr. 15, 2014) ("Claims alleging that a uniform policy consistently applied to a group of employees is in violation of the wage and hour laws are of the sort routinely, and properly, found suitable for class treatment.") (quoting Brinker Restaurant Corp. v. Superior Court, 53 Cal. 4th 1004, 1033 (2012)).  JCP focuses its arguments almost exclusively on predominance and does not, beyond those arguments, address whether commonality is satisfied.  The court is satisfied that there is a common question and addresses JCP's arguments on predominance below.

### c.   Typicality

Rule 23(a)(3) requires the representative party to have claims or defenses that are "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992) (internal quotation marks omitted).  "The test of typicality is whether other members have the same or similar injury, whether the action "is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." Id. (internal quotation marks omitted.)  "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." Id. "[R]epresentative claims are typical if they are reasonably coextensive with those of absent class members; they need not be

substantially identical." <u>Hanlon</u>, 150 F.3d at 1020.

In this case, the named Plaintiffs' claims and the claims of putative class members all arise from the challenged provisions in the MTO, are based on the same legal theories, and involve similar injuries in the form of purportedly improperly denied or forfeited vacation benefits.

JCP contends that Plaintiffs are atypical of the class because none of them were ever MA and none of them satisfied the "facial requirements" to accrue vacation time under the JMTO. (Doc. No. 121 at 25.) But JCP does not explain why it matters that Plaintiffs were never MA, and there is no obvious reason why Plaintiffs, who are former PTNMA, cannot effectively represent MA, whose vacation benefits are governed by a simpler provision of the same policy that governs PTNMA and is, according to Plaintiffs, illegal for the same reasons.[7] Nor does it matter for purposes of this analysis that none of the named Plaintiffs satisfied the so-called "facial requirements" to accrue vacation time, as those requirements appear to be the very provisions Plaintiffs contend are illegal. Given that Plaintiffs' claims are essentially identical to those of PTNMA class members, who comprise almost the entire class, and very similar to those of MA class members, the court finds the typicality requirement satisfied.

### d. Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 625 (1997). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs

---

[7] As noted earlier, the court leaves open the possibility of future subclasses.

1   and their counsel prosecute the action vigorously on behalf of the class?"  <u>Hanlon</u>,

2   150 F.3d at 1020.

3        In support of their motion for certification, Plaintiffs submitted declarations

4   stating, among other things, that they understand their duties and that they will

5   continue to vigorously prosecute this case on behalf of the class.  (MTC, Tschudy

6   Decl., Walker Decl., Candelaria Decl.)  Plaintiffs' counsel submitted declarations

7   and detailed biographies indicating that they are experienced in wage-and-hour

8   class litigation.  (MTC, Ostroff Decl. ¶ 7 & Exh. 1; MTC, Kostas Decl. ¶ 2 & Exh.

9   1.)  And the court has not been made aware of any conflicts that threaten to impair

10  the representation.  JCP contends that Plaintiffs are not adequate for the reasons that

11  their claims are atypical, (Doc. No. 121 at 25), but, as discussed above, Plaintiffs'

12  claims are typical of the class.  Accordingly, the court finds that Plaintiffs and their

13  counsel are adequate to represent the class.

14       **4.      Rule 23(b)(3) Requirements**

15       As noted above, to certify a class under Rule 23(b)(3), the court must find

16  (1) "that the questions of law or fact common to class members predominate over

17  any questions affecting only individual members," and (2) "that a class action is

18  superior to other available methods for fairly and efficiently adjudicating the

19  controversy."  Fed. R. Civ. P. 23(b)(3); <u>Hanlon</u>, 150 F.3d at 1022.  The court

20  addresses each consideration below.

21       **a.      Predominance**

22       Rule 23(b)(3)'s predominance requirement is more stringent than Rule

23  23(a)(2)'s commonality requirement.  The analysis under Rule 23(b)(3) "presumes

24  that the existence of common issues of fact or law have been established pursuant

25  to Rule 23(a)(2)," and, "[i]n contrast to Rule 23(a)(2), Rule 23(b)(3) focuses on

26  the relationship between the common and individual issues."  <u>Hanlon</u>, 150 F.3d

27  at 1022.  For purposes of this inquiry, there is "clear justification" for handling the

28  dispute on a representative basis "[w]hen common questions present a significant

1  aspect of the case and they can be resolved for all members of the class in a single

2  adjudication." Id. (internal quotation marks omitted).

3       In this case, the overriding question is whether JCP's uniform policy violates

4  California labor law.  Certainly, the policy itself contains different provisions

5  (or limitations) that may affect putative class members differently, depending on

6  the length of employment and hours worked (or averaged).  But, fundamentally,

7  the issue is the same for all putative class members:  Does JCP's uniform policy

8  of deferred vesting cause a "forfeiture" within the meaning of the California Labor

9  Code?  The answer to that question will not depend upon, for example, whether

10  an otherwise qualified employee was "employed on the first day of the thirteenth

11  month" following a twelve-month period of employment, or what each employee

12  believed about the provisions of the policy.  Rather, the inquiry will be whether

13  non-entitlement to "accrued" vacation "deposits," predicated upon the challenged

14  provisions of JCP's policy, is illegal.  On the other hand, if JCP's policy passes

15  muster, as, for example, advance payment of wages or compensation, then that

16  result applies across the putative class as well.  The court concludes, therefore,

17  that common questions predominate.

18       In its motion to strike and its opposition to Plaintiffs' motion for certification,

19  however, JCP argues at length that this case cannot be litigated as a class action

20  because individualized questions of contract formation predominate, and because

21  Plaintiffs all claim reliance on different sources for their understanding of the MTO.

22  (Doc. No. 93-1 at 9–21; Doc. No. 121 at 16–21.)  In support of those propositions

23  it relies on this court's order denying summary judgment and the existence of the

24  various MTO documents.  (Id.)

25       But the court's only conclusions at summary judgment were that JCP had

26  not established that it had made the JMTO available to employees, and that the

27  documents Plaintiffs had received did not make clear that MTO deposits are

28  advances for future work, as opposed to compensation for past services.  (See

Doc. No. 78 at 11–12.)  That is all.  Indeed, California Labor Code § 227.3 contemplates that vacation benefits are controlled either by a "contract of employment <u>or</u> employer policy."  (Emphasis added.)  In this case, as discussed above, all versions of the MTO contain the challenged provisions, and JCP does not dispute that it applies the MTO according to its terms as to all PTNMA and MA.  Because Plaintiffs challenge the legality of a uniform policy that, at this point, appears to be uniformly applied, there is no need for individualized determinations.

JCP asserts also that the need for individualized damages determinations precludes class certification.  (Doc. No. 93-1 at 21–25.)  But the Ninth Circuit has instructed that "individualized monetary claims belong in Rule 23(b)(3).  Thus, the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)."  <u>Levya v. Medline Indus. Inc.</u>, 716 F.3d 510, 514 (9th Cir. 2013) (internal quotation marks omitted).  In <u>Levya</u>, the fact that individualized damages determinations would be necessary did not preclude a finding of predominance where the defendant company's "computerized payroll and timekeeping database would enable the court to accurately calculate damages and related penalties for each claim."  <u>Id.</u>

Here, as in <u>Levya</u>, if putative class members prove JCP's liability, damages will be calculated based on the wages each employee lost due to JCP's unlawful practices.  Based on Plaintiffs' submissions, JCP's employment records appear to contain all the information necessary to calculate damages, including each employee's name, contact information, hire date, termination date, weekly hours worked, pay rates, and MTO deposits and usage.  (<u>See</u> Doc. No. 119-1 at 14.)  Accordingly, the fact that damages will need to be calculated for each employee if Plaintiffs prevail does not preclude a finding of predominance.

### b.    Superiority

Whether a class action is the superior method of litigation depends on (1) "the class members' interests in individually controlling the prosecution or

1  defense of separate actions"; (2) "the extent and nature of any litigation concerning

2  the controversy already begun by or against class members";  (3) "the desirability

3  or undesirability of concentrating the litigation of the claims in the particular

4  forum"; and (4) "the likely difficulties in managing a class action."  Fed. R. Civ. P.

5  23(b)(3)(A)–(D).

6  　　　In this case, putative class members stand to recover relatively small sums

7  of money, making individualized litigation unlikely.  The court is not aware of

8  any similar or related cases in California.  This court is an appropriate forum for

9  resolution of the case, as the claims are under California law and the class is limited

10  to California employees.  And, as discussed above, the court is not aware of any

11  likely difficulties in managing this case.  Accordingly, the court finds that a class

12  action is the superior method of resolving Plaintiffs' claims.

13  **C.	Appointment of Class Counsel**

14  　　　Rule 23(g) requires the court to appoint class counsel when certifying a case

15  as a class action.  The court must consider the following four factors:  (I) the work

16  counsel has done in identifying or investigating potential claims in the action;

17  (ii) counsel's experience in handling class actions, other complex litigation, and

18  the types of claims asserted in the action; (iii) counsel's knowledge of the applicable

19  law; and (iv) the resources that counsel will commit to representing the class.

20  Fed. R. Civ. P. 23(g).

21  　　　Based on their submissions, the court is satisfied that Plaintiffs' counsel of

22  record, Sheldon A. Ostroff, of the Law Offices of Sheldon A. Ostroff, and James C.

23  Kostas, of Huffman & Kostas, meet the criteria of Rule 23(b) and should serve

24  as class co-counsel.

25  **D.	Evidentiary Motions**

26  　　　As noted earlier, the parties filed several evidentiary objections and

27  corresponding motions to strike related to their motions on class certification.

28  Plaintiffs object to statements JCP's counsel submitted regarding former Plaintiff

1  Leticia Hinojosa, (Doc. No. 97), and portions of employee declarations JCP

2  submitted in opposition to the motion for class certification, (Doc. No. 124).

3  JCP objects to various aspects of Plaintiffs' declarations.  (Doc. No. 121-1.)

4      Because class certification is a preliminary procedure, "evidence presented

5  in support of class certification need not be admissible at trial."  Makaeff v. Trump

6  Univ., LLC, 2014 WL 688164, at *20 (S.D. Cal. Feb. 21, 2014); Amalgamated

7  Transit Union Local 1309, AFL-CIO v. Laidlaw Transit Servs., Inc., 2009 WL

8  249888, at *3 (S.D. Cal. Feb. 2, 2009).  Accordingly, at this stage, the court

9  overrules the parties' evidentiary objections and denies the motions to strike.

10                              **CONCLUSION**

11      JCP's motion to strike the class allegations from Plaintiff's second amended

12  complaint (Doc. No. 93) is DENIED.  Plaintiffs' motion to certify this case as a

13  class action (Doc. No. 119) is GRANTED.  Plaintiffs' counsel of record, Sheldon

14  A. Ostroff, of the Law Offices of Sheldon A. Ostroff, and James C. Kostas, of

15  Huffman & Kostas, are APPOINTED AS CLASS CO-COUNSEL.  The parties'

16  evidentiary objections are overruled, and their motions to strike evidence related

17  to the motions for class certification (Doc. Nos. 97, 121-1, and 124) are DENIED.

18      IT IS SO ORDERED.

19  DATED:  December 17, 2014

20                              _____

21                              Hon. Jeffrey T. Miller
                                United States District Judge

22

23

24

25

26

27

28